Good morning, Your Honors, and may it please the Court, my name is Saer Stettler, and I represent Rodney Berryman, Sr., the petitioner-appellant in this case. Excuse me, I already can tell you I'm going to have trouble hearing. I'm wondering if the back doors could be shut. You know, I think also another reason for this is you have two microphones, and I might be wrong in the technical. Which should I be aiming for? Individuals will. But I think the microphone to your right, that smaller one, is actually the court microphone, and the other is the audience microphone, so. Could I touch that one, please? The larger mic is the one that you need to speak into. Okay. Okay. So just speak up a little. It's a big room. Thank you. Thank you, Your Honors. This appeal arises from a Kern County capital case from the late 1980s. Mr. Berryman was sentenced to death after his jury was presented with a misleading and incomplete picture of his life because his trial counsel provided ineffective assistance of counsel to the prejudice of Mr. Berryman. Mental health experts, which were hired by trial counsel, requested testing that would have backed up the diagnosis that was given to defense counsel, and this testing would have helped provide the jury with a more complete picture of Mr. Berryman's mental health status, both at guilt and penalty, yet trial counsel failed to make the request of the court for this funding. Counsel, could I ask a question there? The briefing makes several references, and I've looked through the record, at where Drs. Benson and Pierce testified in the penalty phase. I'm not sure that it ever really comes out and says that in the guilt phase there was no allusion to this, what I'm going to call an organic brain syndrome. Was there any reference to seizures or anything along those lines in the guilt phase? In the closing, I don't see it. I don't believe so, Your Honor. So this was new news at the penalty phase? Well, it was not new news in the sense that trial counsel was aware. I'm sorry, I didn't ask a good question. I meant as far as from the jury's perspective. From the jury's perspective. All right, thank you. May I ask you also, as you address this, what denied the request, but without explanation? So in that case, do we insert ourselves and say, is there any possible rationale that the Supreme Court could have had for that decision? Or does Harrington v. Richter apply? And I would appreciate your position on that. Of course, Your Honor. As we discussed in our briefs and our Rule 28J letters providing supplemental citations to the court, the recent U.S. Supreme Court of Wilson v. Sellers directs courts to look through, to follow Ilst v. Nunnemaker and look through the silent denial, which was the California Supreme Court's postcard denial, merely denying on the merits the state habeas petition, and look through to the last reasoned opinion, which was the Supreme Court's direct appeal opinion. But they really came out simultaneously, didn't they? Yes, they did. So it's an unusual situation where they really, in some respects, you could say they collapsed the two and made their decision. Exactly. And it was somewhat unusual in that ineffective assistance of counsel claims are evidence. But in this case, they were raised both in the appellant's opening brief and the state habeas petition. And state habeas counsel requested funds for the same testing that should have been done at trial, the request that was never made at trial. And the denial of those funds at the California Supreme Court level occurred contemporaneously with the issuance of the direct appeal opinion and the denial on state habeas. But getting back to your question, the U.S. Supreme Court in Wilson v. Sellers directs us to when we're faced with a different situation from what occurred in Harrington v. Richter, which was simply a postcard denial, a silent denial with no similar claim raised in a prior appellate brief and covered in an appellate opinion, here we have a reasoned opinion by the California Supreme Court. But doesn't the California Supreme Court typically consolidate the state habeas and direct appeal when it wants to issue one opinion that covers both? Sure. And here, we most definitely do not have that, right? Yeah. And over the years, it's changed somewhat as different counsel handles different portions of the case. So sometimes they're split, and there's appellate counsel, state habeas counsel. Sometimes they're not filed as close in time as they were here. But in this case, I believe Your Honor's correct in that they were considering everything that was in front of them. Except, counsel, I'm not sure that's the conclusion I draw from this record, because I think that it was even suggested by defense counsel that they be consolidated. I mean, I saw that verb used. Sure. And the Supreme Court didn't do that. So what do we take from that? From the, if you can call it a decision, at least the inaction. I mean, they didn't consolidate them. Does that matter? I don't think that matters. I mean, in the sense that they issued the opinions contemporaneously, and in that sense, I believe it was as if they were consolidated. I mean, they issued separate opinions, the postcard denial and the reasoned opinion. But it gets back to Judge Watford's questions. They know how to consolidate when they want to consolidate, and you're asking us to treat them as consolidated. And I'm just trying to figure out if you've got any particular reason for that, other than the simultaneous orders. I think merely based on common sense, that they are dealing with the claims that were raised in both the state habeas petition and the appellate opinion. Why is that clear? What is it that you're focused on in the opinion? The facts that they cite in the denial of the, in the appellate opinion, specifically are taken from, I believe, the funds request and the state habeas petition. I guess I'm just asking where, certainly not in the discussion, I don't think, of the ineffective assistance of counsel at the penalty phase claims, because the analysis is so boilerplate there. There's not really a recitation. Well, and that's part of the problem, there's not, though there's a reasoned opinion, it's about a line to three lines per claim. But the very fact that the opinion is not, and I'm focused here on section H or whatever, it's the part that focuses just on ineffective assistance at the penalty phase. What you're asking us to do, I think, is to infer that the California Supreme Court really did pull kind of a gotcha type thing on, you know, in a very serious case involving someone's life. And I just think that seems a lot to ask of us to assume that the court with one hand said, no, you can't have the funding to get these test results, and then on the other hand faulted you for not showing that the results would have mattered. That just seems like kind of an unfair inference to draw, but that's the one you ask us to draw. And I guess I wonder why is that reasonable for us to do here? Well, I think, as Your Honor pointed out, there is a right to due process in state court. The state court has provided guidelines for requesting funds for expert services, and in this case it was clear, the mental health experts made it clear at trial, that extra testing was required. That was due to the ineffectiveness of counsel at trial. That request was never made. But counsel, if it had been made, the standard would have been, is it California Penal Code section 987.9a? Yes, Your Honor. He would have been entitled for the funding request. If it was necessary to adequately prepare his defense, right? And doesn't that get you to needing to show that the testing results would have been admissible? Well, and I think that we can, if you look... So if he had asked, and if the judge had granted the request, presumably the judge would have only granted the request if the testing results would have passed the applicable standard for admissibility, which I think at the time would have been Kelly Fry, is that right? Yes, Your Honor. Okay. So you've got to get through those hurdles, don't you? So I believe, at the last oral argument, Your Honor asked about the March 30th, 2001, district court order that was dealing with the denial of respondents' motion to vacate the transportation order. Exactly. And in that order, the district court deals very extensively, I believe it's a 30-page order, with all of these issues. And one of the things that the court points out is that, well, one, the 987.9 rules are pretty lenient in allowing counsel the resources necessary to provide an adequate defense. Two, there was nothing to lose by making the request, because it's a confidential request, and in fact... That goes to problem one, about the counsel's competence, right? Sure. Yes. So I'm just trying to get at what may seem very unfair to deny this funding request, but if the testing was newfangled or wasn't sufficiently accepted in the scientific community so that it may not have passed the then-prevailing standard, Fry, Kelly, now Dalbert, the standard for admissibility, and I'm not so sure it would have been an unfair ruling. And I'm trying to figure out if I'm correctly understanding your argument, which presupposes that this testing would have been granted and would have been admissible. And again, going back to the March 30, 2001, order in the district court, they handled those... There was an extensive discussion about just that issue, and trial counsel admitted in his post-conviction declaration that was filed with the state habeas exhibits that the only reason he didn't make the request was not worries and concerns about the testing at that time. It was simply he didn't know or thought that he would not get the authorization from the court. To take the prisoner out of county. To take the prisoner out of county to have this testing done. So the district court found that in Holt, another Kern County capital case, which went to trial a couple years later, same trial counsel, same trial judge, this exact scenario occurred again with the mental health experts requesting this additional testing. Counsel making the request this time under 987.9, getting the authorization to get the testing done and transport the prisoner out of county to get the testing done. And then the experts were able to get that evidence, the testing data in. So let's jump to the evidence. Assuming you could get through all these hurdles, and even assuming if we disagreed with you as to which hurdles you need to get to in light of the framework of the California Supreme Court decision, we ultimately end up having to look at the prejudice prong, don't we? Sure. Okay. And jump forward for the district court about six years in 2007 when the district court concludes that there wouldn't really have been prejudice given the nature of the evidence and the nature of the murder. So I think that is a key issue that you need to address on behalf of Mr. Bearman. Why ultimately would it have made some difference? Yes, Your Honor. And I think the main point here is that while the jury convicted rather quickly, they returned a verdict at the guilt phase in less than a day. So clearly they did not think it was a close case as to whodunit. And because of that, trial counsel, it just amplifies the bad decision making that trial counsel had in this case, in that he followed a good guy defense. But that's, you know, that this one year thing or one day, we could argue about that. Sure. And the cases are all over the map as to timing of quick verdicts or slow verdicts. Of course. Doesn't it really come down to the question of the nature of his brain disorder had to do with a potential seizure disorder? Do we agree on that? Yes. Okay. So given that, and you have Dr. Neuer's declaration in the district court, and you have his psychiatrists and others who testified at trial, how do you get to prejudice from this with respect to either the penalty prong or the sentencing? Well, Your Honor, I believe that the prejudice analysis starts with whether one juror would have made a different decision in the sentencing recommendation. And in this case, as I was saying, the trial counsel presented sort of a good guy defense that Mr. Berryman was not violent by nature, was nice to women. You know, there was some what we call classic mitigation presented, such as, you know, trouble in school. Well, more than that. I mean, you had his experts, correct? Sure. And so it wasn't the fact that there were brain issues, neurological issues, all that was on the table, wasn't it? It was on the table, but it was not and the district attorney made light of that fact and essentially asked the jury to disregard the mental health experts because they, you know, were essentially speculating. But counsel, I just want to go straight to it so you have a fair chance, because what I struggle with is these experts testify that they have made the diagnosis, and they may not have used that verb, but they certainly opined that he had this disorder and explained that it took him into a state where he would not have appreciated his conduct, would not have known what he was doing during that time. But the jury had just convicted Mr. Berryman of rape, and there was a lot of evidence that this was not consensual sex. So it seems to me that what the jury would have had to decide had they heard not only Dr. Pierce and Dr. Benson's opinions, but that this testing backed up their opinions, they would have had to decide, it seems to me, that the, that what, that the, because, because those experts said that rape could not have been the result of this involuntary conduct. So they would have, the defense would have been that the sex started out as consensual, it didn't wind up that way, and that then, then the seizure occurred, and that accounted for the murder or, I'm having a hard time stitching it together. You're going to the guilt phase? I can go to the guilt phase or the penalty phase. Either way, I'm trying to figure out what the theory would have been. I mean, I think Your Honor is right. In the guilt phase, you would have to connect the, you know, the mental health evidence and the testing data, backing up the diagnoses of the experts to show that he couldn't have the mens rea to, you know, commit the first degree murder that he was accused of. I think the analysis is much different at the penalty phase, where the mitigation doesn't have to be connected in any way to the, the crime that he's been convicted of. It's more to give a accurate picture of the defendant in front of the jurors, and I think that's what was missing in this case, because, you know, there was no information about his premature birth, his early months in an incubator, the sexual molestation of he and his younger sister by the uncle. And that was deemed hearsay, right? That one slice of evidence was deemed hearsay? By the district court? Well, yes, and I can't think why it wouldn't have been if there had been an attempt to introduce it in the trial court. Is there an exception where we see? Well, what's interesting about the district court's ruling is that much in the way that the California Supreme Court penalized petitioner for not providing more evidence at the appeal and habeas stage, he was punished for not providing the testing information, for example, yet they denied him the ability to get that testing information. The same thing occurred at the district court level, where an evidentiary hearing was requested, where information could have come in about the sexual abuse by the uncle. Why couldn't your client have simply submitted his own declaration? You don't need an evidentiary hearing for that. I'm not sure how aware this Court is about the nature of our relationship and the sort of long-term relationships with each set of counsel that petitioner has had, but it's been a rather difficult one, and I can't speak for the federal habeas counsel who represented Mr. Berryman in the district court, but I understand that there were a lot of difficulties getting him to rationally communicate and understand the So, in other words, I think they wanted to, but that information was not forthcoming. It seems that you're mixing and matching to some degree, though, the neurological testing with the mitigation evidence about, you know, being born early, having a difficult childhood. So as I look through all the evidence that was presented in the penalty phase, and I think it was Dr. Pierce was the one who did the most. He interviewed him for 12 to 13 hours. He had very concrete testimony about, you know, brain injury, disorder, difficult childhood, all backed up, of course, by the family as well. You know, it's just not clear to me what more, why this wouldn't have been even if it were admissible, how it would change the calculus. And I do see the neurological testing request as something separate from the ineffective assistance of counsel for failure to put on more or different evidence. So I'd appreciate your comments on that. Yes, Your Honor. I think what really makes it stand out is what the prosecuting attorney was able to do in closing argument to sort of belittle and minimize the evidence provided by the mental health experts. They essentially made light of the fact that no testing data was given, and because they were simply opinions. They weren't backed up with the concrete. If they had the testing, because now we have a unique situation here, where the testing happened years later. If they'd had that testing at the time, it seems to me then what they would have had is a presentation to the jury that would have been contested, that some experts would have found the test results to be abnormal, and some would have found them to be normal. I don't think there's anything in the record, I can't find it, any record that indicates that Mr. Berryman actually had a history of seizures. Was there anything? I believe there was information related to the work-related head trauma. The forklift incident? The forklift incident, where he fell and injured his head and then had headaches and some seizures related to that. Do you have a citation for a seizure? I will look for that and get back to you in rebuttal, Your Honor. I think it's just my recollection, and looking at my notes, it's about what you say, but slightly different. It said that headaches were consistent with a seizure disorder, as opposed to having seizures, but maybe it ends up being the same. But they did mention in the testimony the seizure disorder connected to his headaches, which was then connected to that accident. Yes. So that's almost where you end up with the testing as well, isn't it? In the sense that, is Your Honor asking about whether the existence of the seizures and then how it would play out in this scenario? And again, I think the problem that we have here is what the... So some of this evidence was presented in the form of expert testimony and opinion, but when the experts said, we really need this testing data to come to a conclusive diagnosis and rule out anything further, trial counsel just assumed that he was not going to be able to get that, and so he didn't make the request at all. And I think the prosecutor then was able to really undermine the expert's opinion because he said, look, if there was testing to back this up, they would have presented it. They would have made... But counsel, I don't mean to interrupt, but I guess the point that I'm trying to get at, and you're almost reaching it, but I'm going to give you a chance. Had all that happened and the testing had come in, then I think you'd have the two experts and you'd have, as you said, test to back up their opinion, and that would say what? Just that his physical condition was consistent with someone who might have had a seizure, but there isn't any evidence that he did, or I don't think there's any evidence he ever did have a seizure, and that's what I'm trying to get at. Is that right? And again, Your Honor, I'm going to check the citations in rebuttal. I'll get back to that question. But I think, again, going back to the prejudice analysis in the penalty phase, there are any number of cases listed in our briefing from both this court and the U.S. Supreme Court where... About causation. Yeah. I'll give you that point. Sure. But also about the importance of brain damage. I mean, that's... Yes, yes, for sure. Brain damage, sexual abuse of minors. I mean, these are some of the things that certainly move jurors to spare lives in many cases, and this court and the U.S. Supreme Court have found that when there are red flags pointing to that sort of evidence, it's really incumbent on the counsel to... Right, right. Forgive me if I have gone back and forth between guilt phase and penalty phase. You've raised the same arguments in both arenas, so thank you. Can I ask you to go back to a question that Judge Christin asked you about earlier as to the Kelly Fry part of this analysis? So the state's experts on federal habeas do speak directly to the state of kind of the medical science in 1988 and say pretty definitively that there is no way either of these tests would have been... There wasn't enough peer-reviewed literature and the like to results being accepted, right, at least as of 1988. Do we have something from your client's experts on federal habeas that refute that? Because that's all I remember seeing that spoke to the question of what was the state of the scientific evidence at the time. Well, I mean, I think... And, Your Honor, I'd like to reserve time for rebuttal and I'll get back to this question, but I think one thing I would like to point out is, again, the March 30, 2001 order, the district court judge made clear that, you know, this evidence did pass the Kelly Fry admissibility test in Holt a short time later before this... Okay, but just to be clear, we're not bound by whatever the district judge found. No, of course not. I'm saying to you that I need to find something in the record that supports that conclusion. I haven't found it, so I'm hoping that you can point me to something. Do you don't have it off the tip of your... No, no. So I'm going to reserve this time... You want to reserve remaining time for rebuttal? Thank you, Your Honor. You may. May it please the court, Brian Means representing the respondent appellee, Mr. Wong, the warden in this matter. I'd like to kind of pick up at the beginning where the court had recognized the fact that we don't have a consolidation of the particular claims here, both on direct appeal and on habeas. I think the reason for that is that we're looking at two different claims. The claims that were presented on direct appeal were just simply allegations, fairly bare allegations at that, of ineffectiveness with regard to testing. Whereas when we get over to habeas, we have a slew of declarations and evidentiary support, including the declarations of Dr. Pierce, Dr. Benson. We have the trial counsel, Dr. Soria's declaration, as well as family and friends. All of those are in support. And as this court has recognized in Zinn-Vonk decisions in Dickens v. Ryan, when you have a substantially increased evidentiary posture on a claim, that makes the claim separate. They're different claims entirely. And that's why we don't have a consolidation of claims. But why did the California Supreme Court not tell us then, and you're saying that this opinion we have is just resolving the direct appeal claims, right? Why wouldn't it tell us that that's what it was doing? Because certainly this subsection H, ineffective assistance of counsel as to penalty, the paragraphs that tick through the court's analysis there certainly make it sound as though they're resolving the whole kit and caboodle, right? Including the more fulsome evidentiary record on state habeas. So if the California Supreme Court were really doing what you're saying it was doing, why wouldn't it have at least made that explicit? I think because the California Supreme Court is writing to an audience who understands California Supreme Court practice. And for over a century, the California Supreme Court has never considered extrinsic or extra record evidence on direct appeal. So when they are referring to and addressing his claim, it's implicit that they are not considering extra record evidence. And because the tests were not part of the direct appeal record, it necessarily had to deny the claim. It didn't have to be that case, for example, if the circumstances were had gone back down to the Superior Court and filed a motion for a new trial and presented this evidence, then it would have been part of the direct appeal record. Then what they had said in their opinion would have been in consideration of that evidence. But given the long history of the California Supreme Court's practice of not considering extra record evidence, that is the only rational conclusion that can be made from that. So you're saying the trial counsel would have had to go back to the trial court, not on habeas, but for a new trial with respect to the death penalty trial and then ask for a new trial there and present new declarations or a new request? Only if they wanted the claim decided on direct appeal. But Mr. Posner, who is a very, very experienced and well-regarded appellate attorney who represented Mr. Berryman in the direct appeal, presented it both ways. Why he presented it on direct appeal and then also presented it on habeas is somewhat of a mystery. But he did present it on habeas, and that was the proper course to have presented the claim. And in fact, both his requests for funding for the medical tests were made in the habeas context, as they should have been. So he even recognized. So I have not looked at the direct appeal brief, but let's just focus on the neurological testing evidence. So what did that brief say with respect to that evidence on direct appeal? Because obviously there's no argument to be made. So I'm a little skeptical that your description of what the California Supreme Court had before it on direct appeal encompassed whatever arguments were being made about this. No, the only thing that they said on direct appeal was simply that counsel was ineffective for not getting these tests done. And that was it. That's all they could say at that point, because they simply didn't have any evidence to support it. That was the subject of these two separate applications for funding to conduct the tests, and those were explicitly made in the habeas context, which they should have been made. And that is where the test would have been conducted in a habeas proceeding, and then the claim resolved in habeas. But California... At that point, the habeas request is denied without opinion, correct? That is correct. So Richter would apply on that, unless of course the court was to somehow to look through the doctrine. But it is my position that the look-through simply has no application under Wilson v. Sellers or the Ills decision, because we're dealing with two separate claims. One claim based on bare allegations, an entirely separate claim based upon evidentiary support. And it's an evidentiary support claim is the one that they had brought on federal habeas, the one that is supported by the declarations of both Soria, Benson, Pierce, and all the family and friend declarations. That's the claim they pursued. That's the claim that is the merits adjudication for purposes of ADPA, not the one on direct appeal. And as you pointed out, Your Honor, to put the petitioner in a catch-22 kind of ascribes a sinister motive to the California Supreme Court in death penalty litigation. It's clear from the length of the direct appeal opinion they took great lengths to consider all of his claims. So it would be somewhat absurd to think that they were denying his application for funding, and then at the same time denying him the claim because he didn't have the test. And in fact, the Supreme Court spoke to a similar issue that is in Viscotti, where it says we have to be careful not to avoid the readiness to attribute error to the state court. And we should give the state court the benefit of the doubt. And I think that applies and is particularly appropriate in this circumstance. So why wouldn't, I mean, I grant you that as a general principle, but in this case, I guess it doesn't strike me as that unreasonable at all from the standpoint of a Federal court like ours looking at this to say, well, if they had really been faulting the petitioner on direct appeal for simply having these bare allegations and no evidence to support the claim, it seems to me that what they would have said, rather than even giving us this boilerplate about you failed to show that the test would have, you know, yielded favorable results or whatever they said, they would have just said this isn't a claim that's appropriate for resolution on direct appeal. There's no record. We'll deal with that on habeas, right? But instead, this is framed strictly in terms of a Strickland kind of no prejudice merits determination. I thought that I don't know. You're exactly right, but there's one thing that makes this case unique. Okay. And that is because Mr. Posner had already filed a habeas petition. See, normally in these circumstances where an appellant on direct appeal presents what really should be a claim presented on habeas, like IAC, that's dependent on extrinsic evidence, the California Supreme Court will admonish them. And if you look at the California Supreme Court decisions, that's exactly what they do. They say, this claim should be brought on habeas. It's denied without prejudice. But Mr. Posner had already done that. He had already anticipated where this was going. He was a very experienced attorney. And he had already filed his habeas petition at this point, and had already raised the same exact ineffective assistance, the counsel claim, except this time he had backed it up with evidentiary support. So the California Supreme Court really had no basis to admonish him to say, this claim should be brought on habeas. It already had them. So that kind of explains why the claim was just presented. But so what are they deciding then? In other words, his habeas claim was the failure to request the testing. I think their language on direct appeal is a polite way to tell him, you can't bring this claim on direct appeal, because there is no extrinsic evidence that can be considered, and the testing results you're referring to are not in the direct appeal record. But they are in the habeas record that they're looking at at the same time, which they then just deny with no reasoning. Well, the testing was not in the record, because they never allowed it. Right. At that point, I mean, it's not until we get to the district court that we have more evidence. That's right. But it was in the record, but the California court had two requests to provide the funding, to let him go get the funding. That is correct. And the California Supreme Court denied those motions. That's correct. Which I think is Judge McEwen's point. So what do we make of that? The petitioner, Mr. Berryman, is not entitled to any form of testing. The California Supreme Court, applying 987.9 in the reasonable necessary standard, would simply deem that the tests were not necessary. Now, of course... Wait, wait, wait. Why? Because it wouldn't have been admissible, or because... Well, of course, now at this point, I'm just going to hypothecate, because under Richter, that's all I can do, and permitted to do. We don't know what the reasons are, because they aren't articulated. So under Richter, we can come up with any reasonable justification. But I think the court has identified the most prominent one, which is under Kelly, the tests were simply inadmissible. And the Supreme Court has repeatedly stated in its published decisions that they will not authorize expenditure of funds on tests and procedures that would not be admissible in the court to begin with. So you're saying that we should just, under Richter, hypothesize what would be a reasonable reason that they might have just denied. Precisely. That's where we end up. That's precisely... Can I ask you... Hypothetical, unhypothetical. I think that's what Richter demands, unless the ADPA somehow has been, somehow rebutted and we're in de novo review. But since we have a merits adjudication, that is not the case. Similar testing was allowed in a couple of cases. Not just Holt, but also Ray. And my question is, in either of those cases, was it admitted? You know, it's really hard to glean much from those cases. Those are trial court decisions. Those weren't decisions that had been taken to the Supreme Court for adjudication of whether they were correct or not. We don't know if the prosecutor had even objected. The tests were actually different. I don't even think we have the same exact test. One's a CAT and the EEG. Yeah, it's not an alcohol induced. It's not that different. And of course, these comparisons are always dangerous. They're not the same year, and it's a little bit off. And they're from a trial court. But do you know whether they were admitted, counsel? They were admitted, evidently, without objection, because there was no challenge on appeal. I think they were admitted in both cases, although they're a few years later. They were, that is correct. Okay. Can I ask, though, just let me push back on one point you suggested. Why is it, in order for Petitioner to win here, that he would need to show that the test results themselves would have been admissible, as opposed to simply being able to refute the argument that he's put the most weight on, which is the effective way the prosecutor, in closing argument, was able to use the absence of the results to essentially undermine any weight to be given the expert testimony that was offered at trial? So, in other words, all Mr. Berryman's experts were saying is that we have, I think they called them soft signs, that he's got this organic brain damage of some sort. That's correct. The one thing we would need to confirm that are these tests. And so if they had, if trial counsel had been, you know, had performed non-deficiently, had gotten the test results, even if they had never come in, at least they would have allowed his experts to say with, in their view, absolute certainty, that he does, in fact, suffer from brain damage, and perhaps at least one juror, given what we know about what the Supreme Court has said about the powerful impact that brain damage evidence can have on jurors in these kinds of cases, maybe one juror would have said, you know what, I am now in a position to credit that expert testimony that was offered, even if the actual test results were never put before them. Well, I don't want to disparage the trial prosecutor in this case, but his closing argument with regards to why the testing wasn't done borderline on frivolous. He had advanced two separate arguments. One, he had said that perhaps they weren't diligent enough, and the second one was that they were afraid. And let me address both of those. Afraid of the results, what the results might show. In other words, they intentionally didn't go after the results. Exactly. Let me address both of those. The first one is that they showed, and they're interrelated, so I think they kind of addressed both at the same time. They had said that they weren't diligent, but the record showed just the opposite. It had showed that Dr. Benson and Investigator Benz, who had a background in medical technology as well as being a private investigator, had searched every hospital they could find in the region to do so, and that's in the record. Dr. Benson, who was a psychiatrist who was leading this effort, had actually gone to the county hospital, met with the staff and personnel there, and then took it one step further. He met with the assistant or the chief of the hospital and lobbied him to get the tests done there. So that really undermined, if not completely defeated, the prosecutor's argument. I thought the prosecutor himself or herself pointed out that, well, they could have gone outside the county. Didn't they make that point? They did, but there was no evidence in the record that there was a place outside the county. He was just speculating, and I think the jury would have picked up on that. But there was nowhere in the greatest state in the United States, in California, where these tests could have been performed. I mean, I understand why they couldn't have been performed in Kern County, maybe. I grant you that. But nowhere in California? The subject just didn't really come up at the trial. It wasn't much of an issue. The prosecutor's key point was that they were afraid. And he was actually just speculating. He was throwing out these reasons. But just go to the other rationale, because the more powerful one, it seems to me, is that the prosecutor invited the jury to discount entirely the expert testimony on the ground that the experts themselves told you they don't have the tests that are needed to confirm this. So you should not give it any weight whatsoever, because they can't even stand behind it. And all I'm saying is that under Petitioner's theory, if they had at least gotten the tests, regardless of whether they got admitted or not, the experts would have been able to say with, I think, a high degree of confidence that, yes, he does suffer from brain damage. Well, there's a number of questions wrapped up in there. And let me try to address them in order. The first one involves the prosecutor's argument that they were afraid to do the test. And I think I may have already touched upon that. And the record evidence was that Dr. Benson had actually tried to. Now, maybe there was evidence he had gone and traveled over to Europe or across the country to try to get the test there. But there's no evidence. But did the jury know that, counsel? Did the jury hear that in response? Because to Judge Watford's point, one of the ways that the prosecutor undermined them was to say they didn't try to get the results, they didn't want to get these tests, because the test could have shown the person doesn't have this organic brain disorder at all. So my question is, did the jury know that Dr. Benson had gone great lengths to try to find a hospital that would do it? Yes. The jury heard that? Yes. From whom? They heard that from Dr. Benson himself. Do you have the ER site for that? I may, Your Honor. I have his testimony right here. I'll check it. Go ahead. Okay. But also, you know, I think there's an important point to be made here as well, is that somehow this evidence was important to the defense. In fact, I think a strong argument can be made that it was probably wiser not to present this evidence at all. In fact, there's a legendary attorney on cross-examination who had proffered the statement or principle that never ask the one question too many. And this is kind of analogous to that, is to pursue those tests actually would have resulted in a less powerful case in mitigation. So you think it was a strategic reason? No. I don't think that's necessarily true. I don't think without an evidentiary hearing or with further factual development. All we know is Counsel Soria's statement that he didn't think that they could do it. I think it's a prejudice argument. So why do you say that? So I think it's a prejudice argument. I think here that if we go back and look at the state of the evidence that was presented at trial, it was a very strong case. And if I can just read from the transcript Dr. Benson's testimony, and he testified what I was able to. Where are you reading from? I am from looking at the reporter's transcript 3897. My copy, unfortunately, does not have ER. That is photocopied off. He says what I was able to find with him, that he does, in fact, suffer from an organic mental syndrome, and that it's probably alcohol-induced. And then he goes on to say, and it may also be due to head injuries. Then a little bit later at RT 3901, he talks about the reason we wanted these tests, because, quote, it was helpful in trying to figure out the why of organicity. And finally, a few pages later at RT 3909, he's asked by trial counsel's story, did you form your opinion? And he asks that question again. He said, yes, I did. He says, quote, well, that opinion is that he suffers from organic brain disease. Second, most likely due to his chronic use of alcohol. Most likely, head trauma played the role. So Dr. Benson is unequivocal in his clinical diagnosis that he does have this brain damage. He's not. I'm looking at 3903. Go right ahead. There are statements that are not nearly as strong for you as what you just read. And I'm looking at 3903, line 14 through 16. So he says, so we were unable to do some of the more sophisticated tests that we felt like would confirm our clinical opinion. Precisely confirm. He says, right. I think that's the key word. It would confirm. Right. And so what the prosecutor said was you don't need to buy anything that they are trying to sell you because the experts themselves have said that they needed these tests to confirm that they were right. And they can't do that. So all they're doing is speculating about what condition he may or may not have in his head. Ideally, in a perfect world, yes, if they could have confirmed it with these tests, that would have been ideal. But what would have happened if these tests had come in? Look what happened in the federal proceeding, even assuming it's not Penholster-Bard, which it is. What would have happened? There's actually a quote from Justice Kennedy out of the decision in Richter, and it talks about the risk of bringing in a battle of the experts and focusing on esoterical questions of science. Here, the prosecutor had not refuted in his case in rebuttal any experts. He offered no experts at all. The best he had were these two fairly, I would presume, I believe to be fairly unpersuasive arguments. In fact, he seemed to be grasping at straws and trying to persuade the jury why not to buy it. Oh, they were diligent, or maybe they were afraid of the results. I mean, that doesn't strike me as very powerful if I'm sitting as a jury. I've heard Dr. Benson say he does, in fact, in my clinical diagnosis, unequivocally, he's got brain damage. Now, I can't confirm that with these other medical tests. We weren't able to get them. That's a pretty strong case. Now, let's say that they actually did get the tests done. Now, the prosecutor has already averred that he would have brought out his heavy hitters. So now in March is two of his experts to match the experts offered by his. Now, we don't know exactly what experts they were, so we're just going to have to assume they were the type that were here, like the expert from Cedars-Sinai and the doctor from UCLA Medical Center, who basically characterized these tests as junk. Now, we're assuming that they're admissible under Kelly to begin with anyways. But even if they had come in, you've got now Dr. Benson or Dr. Wu and his experts saying these tests show brain damage, and then now you've got two other heavy hitter rock star experts coming in for the prosecution saying this is junk science and they are absolutely normal. Now the jury's left scratching their heads with a battle of experts, but it gets much worse. Because when these tests are done, there's always an independent doctor who's reading the results, and in that particular case, Dr. Peter Volk, who runs the PET scan center, was testified or provided a declaration that these tests came out normal, that Mr. Berryman had no brain damage. Now assuming that this played out the same way back in 1988 as it did in the federal court proceeding, which is something we have to assume to be the case, this independent expert would have come in and would have broken the tie. Well, on that very point, though, the district court refused to go there with you because what it said was, well, obviously if I'm going to say that one side's experts were the more believable ones than the other, I'd have to have an evidentiary hearing, and that wasn't granted here. So it seems to me you're asking us basically to do what the district court said can't be done, at least on the state of the record now, which is to say, well, had this battle of experts unfolded, the state's experts would have been more persuasive. I don't see how we could do that. That's what the district court judge alluded to, but I think the Supreme Court in Richter and Penholster vindicated otherwise. And in Richter, they're talking about the dangers and hazards of creating these battle of the experts. They don't remand back down to determine, okay, let's determine the exact credibility of them. They're comfortable by saying, you know something, just the fact it would have created a battle of experts, we know what that means. That means jury confusion, and especially in this particular case, when you've got a neutral, credible, third-party radiologist, neurologist, who's going to take the stand and say, look, I don't have a horse in this race. I don't work for the defense and prosecution here, but I did read this PET scan result, and it's absolutely normal. I mean, I think that says quite a bit about the damning evidence this would have done. And, in fact, ironically, I think if trial counsel had done it that way and had asked the one question too many and brought in these experts, and now we've got the battle of the experts and the independent experts saying that it's normal, I think we'd be looking at a claim of ineffective assistance to counsel for having conducted the test. I think you can separate the PET scan from the EEG, however, given the state of the record before us. So even if you assume that the California, and we go back now to a very narrow standard, the California Supreme Court might have reasonably rejected this because of invisibility, certainly with the PET scan, how can that be said with respect to the EEG when even by the time you get to the district court, everybody agrees that this gentleman has a seizure disorder? Well, I'm not quite sure what kind of seizure disorder he has. It doesn't seem to be the type of seizure disorder that any of the experts describe. I mean, let's go back to all the family and friend declarations. We've got over 16 of them, and a lot of them said, we have seen Mr. Berryman severely intoxicated. And we know from the expert testimony when someone has a seizure, usually they're down on the ground. Not always, but usually. Well, it depends on what kind of seizure it is. Exactly. No, I agree with that point. Usually, and that's what Dr. Neuwer says. But at a minimum, when a person has a seizure, the vast majority of the time you're going to be on the ground or you're going to be kind of catatonic. People are going to notice something's gone wrong with you or you're going to act confused, sleepy, different. But yet, he's in these large gatherings with people when he's intoxicated. He's in intimate settings with one-on-one individuals. And no one in their declaration says, I've ever seen him do anything of a seizure nature. In fact, Mr. Berryman, when he's talking to his experts, he's talking to Dr. Benson, he's talking to Dr. Pierce, he's talking to his attorneys, he never says, hey, you know, I've got to tell you, this weird thing happens to me. I all of a sudden get this headache or this thing happens and then I just kind of blank out and I'm confused and tired. We don't have any of that. I mean, the whole idea that he's having these seizures, I just don't think is very convincing to a jury. Is there any evidence, going back to this, but Judge McEwen mentioned that on the forklift incident, there's a mention of consistent with. But there's certainly a history of headaches, no question. And he had a pretty remarkable history of head injuries. It struck me, I don't know, three or four or five head injuries, but I can't see a history of seizure activity. I'm unaware of any type of evidence of seizure activity, Your Honor, whom considering the record. What about the other mitigating evidence that the jury didn't hear that Mr. Berryman argues he was prejudiced by? Well, there's quite a boatload of different evidence. I've broken that down into probably nearly a dozen different categories. What strikes me, I'm not sure there's a boatload. There's quite a bit of evidence that came in not through his family members, but came in through the experts. But in terms of maybe you could help identify exactly what wasn't heard. I think defense counsel is correct that the testimony about Mr. Berryman being born premature didn't come in or the fact that he spent the first month of his life in an incubator. We talked about the sexual assault, and there's a hearsay problem with that coming in. But what about the other evidence that wasn't offered? As I recall, at the prior hearing on this, Judge Kaczynski sought to draw out all of this evidence, and I think you were part of that. And I think you have accurately summarized the evidence that was not. Everything else was a function really more of a theory of common sense. The jury knew that he was a slow learner, but I don't think the jury heard that his IQ was at one point measured at 75. Is that right? There's actually two measurements, 75 verbal and 78 as well. Did the jury hear that evidence? They didn't hear that. Or did they hear that he was just a slow learner and in special education as a child? That's the kind of evidence we would typically see in a mitigation case, right? It could be. It often is. It's also double-edged sword, too, because they could also, as the court in Penholster found out or have identified, that when somebody has such a lower IQ, it can also be that they're beyond rehabilitation. That's what your brief argues. But can you just remind me if there are any other pieces of evidence that you want an opportunity to respond to? I would on the IQ. First of all, it's questionable whether he should be permitted to raise that because the question of the IQ score, intellectual disability, mental retardation, themes along that line, they were never raised in the district court. I'm not sure it's appropriate to be raising them now. I throw out the possibility that perhaps those are forfeited at this stage. But aside from that, that evidence concerning the IQ score, I think actually would have been potentially detrimental to him because if we look back at the record, the individual that took the IQ score of 75 verbal and 78 in performance characterized that score as spuriously low, which means falsified. That doesn't put Mr. Berryman in a very good light. What about as a child, though? Well, we already have the cumulative evidence, evidence that was already coming in, that he had a long history of special education. He was identified as a slow learner by third grade. He was unable to read and write even in his late teens, unable to hold a job, seven to eight schools. All that came in, the jury had heard that. So it's somewhat cumulative to say that he had an IQ score. And in addition, the IQ score by the person that administered the test said it's artificially low because basically Berryman was gaming the system and characterized it, in their words, as spuriously low. I don't think that's something you want the jury to hear. And in addition to that, part of what comes in with that evidence, and under Belmonting we know the bad comes in with the good, is that they said, quote, Rodney has trouble controlling or problems controlling his temper. I don't think you want the jury to hear that when you're trying to say that this person has been redeemed and will not be a problem in prison. Your Honor, I see I'm out of time. You are. Thank you. Thank you. You have some rebuttal time. Thank you, Your Honors. First off, obviously if it would assist the Court, we'd be happy to provide any supplemental briefing on any of the points discussed here today. I did want to make a point regarding the consolidation of the appeal and the habeas. It's unclear why the California Supreme Court did not make that clear in the direct appeal opinion as they have at times in the past. But what it is clear is that they did reference language that was taken directly from the habeas petition. I believe we had it at page 1108. They reference background and character in the appellate opinion when they're denying the IAC claim, and that phrase is used repeatedly in the state habeas petition. So it makes clear to me at least that they were reviewing both of them and presenting this opinion as a way to kind of deal with both the AOB. But there's nothing in the, I guess we'll call it the merits opinion on direct appeal, that directly references back to the new posture the case takes in terms of the allegations and the affidavits that were presented in the state habeas proceeding, is there? And again, no, Your Honor, I believe there is not, but there's really not much in the appellate opinion, period. I mean, they dispose of claims that are often four or five pages or more in two or three sentences. But I think that does make clear that they were addressing all of the record that was before them. And just to get back to the issue about the battle of the experts, I think Your Honors are well aware that the import of the prosecutor's challenge to the experts not having the data is what really stands out. Because if you take the prosecutor's line and get rid of the mental health experts, you're really left with a pretty incomplete picture, which is the family members saying that Rodney's a good guy, which doesn't line up very well with what the jury just decided in convicting him. So I do think that the testing data would have allowed them to be very firm in their opinion that this is a brain-damaged individual who does suffer seizure-like incidences. And again, to your question regarding whether there's any solid evidence of the seizures, I think there was evidence from the family members in declarations regarding these headaches and dizzying experiences, which the mental health experts say were like grand mal seizures. So I don't know that there's more evidence than that. But the doctors viewed those as seizures, and that's why they wanted to do this testing to kind of back up that there is this disorder. Before you sit down, can you just let me know, did you find anything in the record to refute the State's experts' assertions that these tests were not, as of 1988, recognized in the medical science? Your Honor, I did not find anything. What we had at our fingertips, and again, I would like to, if Your Honors would appreciate any supplemental briefing, I do believe there was something from the experts about it, but I'd have to go back. Mr. Justice, not supplemental briefing, but you can simply submit to the Court the citation. Yes, a 28-J letter. And if the State's lawyer wants to then provide a counter-citation, you may do that, but again, without argument. Of course, Your Honor. Thank you very much. Thank you. The case of Berryman v. Wong is submitted. I would like to thank both counsel for your very excellent arguments, and also for coming to San Diego for the argument. With that, the Court is adjourned for the morning. We will start our conference. We don't want to delay coming back, but we'll at least begin a conference. And during that time, our law clerks are here, and they're happy to answer questions from the students. But we'll be back out shortly to talk with you with questions. And, of course, as you might imagine, as I know the counsel will appreciate, you may not ask any question that relates to this case or to this particular counsel. So with that, the Court is adjourned for the morning. Thank you.
judges: McKeown, Christen, Watford